Case 1:26-cv-03090-JPC   Document 1-3   Filed 04/15/26   Page 1 of 18

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

ANN MARY ABRAHAM,

        *Plaintiff,*

    -against-

JPMORGAN CHASE BANK, N.A.,

        *Defendant.*

Case No. 151468/2026

**COMPLAINT**

**JURY TRIAL DEMANDED**

By and through the undersigned counsel, Plaintiff ANN MARY ABRAHAM ("Plaintiff"), with knowledge as to her own acts and investigation of counsel as to the acts of others, and believing that further investigation and discovery will confirm that the allegations recited herein have substantial evidentiary support, states as follows:

### Introduction

1. Pursuant to the Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq. ("FCRA"), and the New York Fair Credit Reporting Act, N.Y. GEN. BUS. LAW § 380 et seq. ("NY FCRA"), Plaintiff brings this civil rights action against Defendant JPMORGAN CHASE BANK, N.A. ("Defendant") to recover actual, statutory, and punitive damages. In addition, Plaintiff is entitled to an award of costs and attorney's fees in this fee-shifting action.

2. In 1970, Congress passed the FCRA and enshrined within it the "need to insure that consumer reporting agencies" (CRAs) "exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy." FCRA § 1681(a)(4).

3. "A credit report can determine everything from whether a person can secure a credit card, purchase a home, win a new job, or start a small business. Recognizing the importance of

accuracy in credit reporting, Congress adopted the Fair Credit Reporting Act in 1970 (FCRA)." *Dep't. of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 US 42, 45 (2024).

4. When a consumer like Plaintiff disputes the accuracy of information through the CRAs, those disputes are transmitted to the party furnishing the information. Here, that entity is Defendant. The FCRA demands that each entity reporting or furnishing data about consumers separately conduct a reasonable investigation of the consumer's dispute and correct or delete information they learn to be inaccurate or cannot otherwise verify.

5. Furnishers such as Defendant have their own independent duties under the FCRA, principally those found at 15 U.S.C. § 1681s-2. The duties on furnishers were enacted almost thirty years ago, in 1996. THE CONSUMER CREDIT REPORTING REFORM ACT OF 1996, Pub. L. No. 104-208 (1996).

6. "[T]he term 'investigation' is defined as '[a] detailed inquiry or systematic examination' or 'a searching inquiry.'" *Hinkle v. Midland Credit Mgmt., Inc.,* 827 F.3d 1295, 1303 (11th Cir. 2016) (quoting Johnson, 357 F.3d at 430); see also *Gorman v. Wolpoff & Abramson, LLP,* 584.F3d 1147, 1156 (9th Cir. 2009).

7. Data furnishers like CHASE owe independent duties to consumers. As the subcommittee noted, data furnishers "often conduct pro forma, perfunctory investigations, ignoring consumer-submitted documents and information." Such investigations are "insufficient" under the FCRA.[1]

---

[1] *Select Subcommittee Requests CFPB Review After Investigation Finds Nation's Top Credit Bureaus Failed to Address Errors in Consumer Credit Reports, Press Release, supra,* (citing *Automated Injustice Redux, Ten Years after a Key Report, Consumers Are Still Frustrated Trying to Fix Credit Report Errors,* National Consumer Law Center (February 2019), http://www.nclc.org/wp-content/uploads/2022/08/automated-injustice-redux.pdf.)

8. In addition to the requirement under 15 U.S.C. § 1681s-2(b)(1)(B) that the furnisher consider all information forwarded by the CRA, the furnisher cannot ignore what it already knows; "In deciding that the notice determines the nature of the dispute to be investigated, we do not suggest that it also cabins the scope of the investigation once undertaken." *Gorman,* 584 F.3d 1147 n.11 (9th Cir. 2009).

9. Plaintiff is a victim of identity theft perpetrated by her ex-boyfriend Ben Pramod ("Pramod") of Elmont, NY, who obtained Plaintiff's private identifying information (PII) when he sold her a vehicle. Plaintiff was living in Long Island at that time. Pramod opened multiple accounts with Defendant in Plaintiff's name fraudulently and without Plaintiff's permission or knowledge. "An identity theft occurs when someone misappropriates another person's name or other personal information in order to engage in fraud or other crimes. Predictably enough, this criminal activity will often result in adverse alerts to credit reporting agencies and significant damage to the victim's credit worthiness." *Galper v. JP Morgan Chase Bank, NA,* 802 F. 3d 437, 441 (2nd Cir. 2015).

### Plaintiff's Rights as an Identity Theft Victim According to the
### Identity Theft Resource Center

10. Founded in 1999, the Identity Theft Resource Center® (ITRC) is a national nonprofit organization established to empower and guide consumers, victims, business and government to minimize risk and mitigate the impact of identity compromise and crime.

11. According to the ITRC web page section setting forth the "Foundations of Identity", consumers have the following rights:

     a. a right to an unencumbered identity[2]

---

[2] *Foundations of Identity*, Identity Theft Resource Center (accessed February 18, 2025), https://www.idtheftcenter.org/about-us/

Case 1:26-cv-03090-JPC    Document 1-3    Filed 04/15/26    Page 4 of 18

b.  a right to be notified if Plaintiff's identity credentials or data are compromised, used, or misused,

c.  a right to remediate/recover Plaintiff's identity without undue burden, financial or otherwise, and

d.  a right to be acknowledged as a victim of a crime.

12. Plaintiff contends that, by their respective failures to comply with the FCRA and despite Plaintiff's repeated disputes about identity theft, each CRA:

a.  encumbered her identity,

b.  compromised and/or misused her identity,

c.  failed to acknowledge Plaintiff as a victim of a crime in at least one circumstance, and

d.  impeded Plaintiff's efforts to recover Plaintiff's identity.

13. As a result, Plaintiff asserts damages for undue burden, financial and otherwise, in Plaintiff's attempts to remediate/recover Plaintiff's identity.

14. Defendant publishes consumer education on its website[3] instructing consumers who are victims of identity theft to file police reports and FTC reports, dispute to the CRAs, and notify affected credit card banks. Defendant also uses this page to advertise its identity monitoring product, "Chase Credit Journey." Defendant closes its identity theft page with the reassuring statement that: "The stress of fraud need not get in the way when you need to report identity theft and start your recovery process. With this checklist in hand and helpful resources such as Chase Credit Journey by your side, you can get started on the path to credit

---

[3] https://www.chase.com/personal/credit-cards/education/credit-score/how-to-report-identity-theft (accessed March 2, 2026)

Case 1:26-cv-03090-JPC    Document 1-3    Filed 04/15/26    Page 5 of 18

restoration today."[4]

### Plaintiff's Rights as an Identity Theft Victim

15. Plaintiff has a right to an unencumbered identity.[5]

16. Plaintiff's identity was encumbered by Defendant's actions.

17. Plaintiff has a right to be notified if Plaintiff's identity credentials or data are compromised, used, or misused.

18. Plaintiff's identity was compromised and/or misused due to the actions of Defendant.

19. Plaintiff has a right to remediate/recover Plaintiff's identity without undue burden, financial or otherwise.

20. Defendant caused Plaintiff undue burden, financial and otherwise, in Plaintiff's attempts to remediate/recover Plaintiff's identity.

21. Plaintiff has a right to be acknowledged as a victim of crime.

22. Despite Plaintiff's repeated disputes about identity theft, Defendant failed to acknowledge Plaintiff as a victim of a crime.

23. Defendant, by refusing to comply with the FCRA, impeded Plaintiff's efforts to recover Plaintiff's identity.

### Summary of Plaintiff's Claims Against Defendant Pursuant to the Fair Credit Reporting Act and/or New York Fair Credit Reporting Act

*Plaintiff's Claims Against Defendant.*

24. Based on acts and omissions described more fully below in the Statement of Facts, Defendant is liable to Plaintiff for violating § 1681s-2(b) of the FCRA by its acts and omissions, including but not limited to:

---

[4] Id.

[5] *Foundations of Identity*, Identity Theft Resource Center (accessed November 7, 2024), https://www.idtheftcenter.org/about-us/ (listing Experian as a "financial supporter").

Case 1:26-cv-03090-JPC     Document 1-3     Filed 04/15/26     Page 6 of 18

a. failing to conduct reasonable investigations of Plaintiff's disputes of multiple fraudulent credit card accounts reporting on Plaintiff's credit reports after, upon information and belief, Defendant received notice of Plaintiff's disputes from the CRAs;

b. failing to review all relevant information provided to Defendant by the CRAs concerning Plaintiff's disputes of the fraudulent credit card accounts; and

c. failing to promptly modify, delete, or permanently block any and all information about the disputed fraudulent credit card accounts that Defendant, had it conducted reasonable investigations of Plaintiff's disputes, could not have affirmatively verified as accurate.

## Jurisdiction and Venue

25. The jurisdiction of this Court is conferred by CPLR § 301 and CPLR § 302(a).

26. Venue is proper in this Court under New York Civil Practice Law and Rules ("CPLR") § 503(c) because Defendant Chase resides in New York County.

27. The injury to Plaintiff occurred in this jurisdiction and Defendant resides in this jurisdiction.

## The Parties

28. Plaintiff ANN MARY ABRAHAM is an individual and "consumer" within the meaning of the FCRA (15 U.S.C. § 1681a(c)) and NY GBL § 349-a(c). Plaintiff now resides in Sugar Land, Texas.

29. Defendant JPMORGAN CHASE BANK, N.A. is a national association duly authorized and qualified to do business in the State of New York that, upon information and belief, conducts business in the State of New York and is a "furnisher of information" within the meaning of the FCRA. 12 C.F.R. § 1022.41(c).

Case 1:26-cv-03090-JPC    Document 1-3    Filed 04/15/26    Page 7 of 18

## Statement of Facts

30. Plaintiff, ANN MARY ABRAHAM, is a victim of identity thefts perpetrated by her ex-boyfriend, Ben Pramod of Elmont, NY. Ben Pramod is the owner of Ben E Fit Auto Vault. Pramod obtained Plaintiff's PII and contact information for Plaintiff's father in 2023 when Pramod sold Plaintiff a vehicle. Plaintiff was living in Long Island at the time and had only resided in the U.S. since 2019. Plaintiff's first language is not English, and she is unsophisticated in financial matters. Unbeknownst to Plaintiff until months later, Pramod manipulated Plaintiff's trust and leveraged the power imbalance between himself and Plaintiff to commit financial crimes against Plaintiff. Pramod fraudulently opened multiple credit cards and cellular telephone accounts in Plaintiff's name. Plaintiff did not discover the fraud against her until April 2025, when Plaintiff's credit score dropped due to Pramod's defaults on the accounts he opened.

31. Pramod took great pains to make his crimes look like consensual activity through carefully planned deceit, financial entanglement, and coercive control wielded during his relationship with Plaintiff. Under the guise of "helping" Plaintiff get established in the United States, Pramod instructed Plaintiff to use Pramod's mailing address on her professional resume. Under the guise of "helping" Plaintiff build credit in America, Pramod opened one American Express credit card "for" Plaintiff; in reality, Pramod had secretly opened it a year prior in Plaintiff's name without her knowledge or consent, and Pramod had already run up the balance on the card before giving it to her. After Pramod gave her that card under fraudulent pretenses, he added himself as an "authorized user" without Plaintiff's knowledge or consent and then used this card for expensive international travel to India. After Plaintiff discovered the truth and the multiple other fraudulent credit cards, she confronted Pramod, but he

continued to manipulate and control her. Pramod promised to repay, even manipulating Plaintiff into a payment plan with American Express in the course of a three-way call with American Express's fraud department.

32. Plaintiff also discovered that her Experian account had been compromised and linked to Pramod's phone number and email, meaning Plaintiff would not have received alerts about the fraudulent activity.

33. On June 3, 2025, Plaintiff filed a police report with the police in Sugar Land, TX, but was advised that New York would have jurisdiction over the matter.

34. The United States Department of Justice (DOJ) has aggressively pursued justice for victims much like Plaintiff. The DOJ details how financial exploitation, identity theft, romance scams and similar fraud involve patterns of gaining trust and affection, financial maneuvering and commingling under false pretenses orchestrated by the perpetrator to appear consensual, and coercive control of victims as a cover for criminal activity, e.g.: *United States v. John William Alderson,* 2:19-CR-00012-RAJ, Dkt. 37 (W.D. Wash., October 25, 2019) (U.S.'s Sentencing Memorandum detailing how perpetrator opened multiple credit cards in victim's name, ran up the cards, and then made fraudulent identity theft chargeback disputes; perpetrator induced victim to write the perpetrator checks under the guise of depositing them into a shared account); *United States v. Dion Lamont Camp*, 2:23-CR-00063, Dkt. 231, PageID#3248 (E.D. VA., Jan. 1, 2026) (perpetrator's "scheme to defraud consistently involved meeting women and developing a coercive relationship, which led them to take out continued loans for him and accept his continued promises to repay"); *United States v. Keith Raniere*, 1:18-CR-00204-NGG-VMS, Dkt. 914 (E.D. NY, Aug. 27,

2020) (U.S.'s Sentencing Memorandum detailing coercive control and financial and sexual exploitation of victims under guise of personal development seminar "NXIVM").

35. Like any financial crime victim, Plaintiff was not capable of consenting to criminal activity against her. She did not realize she was a victim of financial domestic abuse and did not know about the multiple other fraud accounts until April 2025 when she discovered a significant drop in her credit score.

### Plaintiff Discovers and Disputes the Fraudulent JPMorgan Chase Accounts

36. Pramod opened fraudulent credit card accounts with Defendant that were assigned the account numbers: x3513, which is the same account as x4129 ("4129/3513") and x8690, which is the same Account as x5539 ("8690/5539") (collectively, the "Accounts.") It is Defendant's practice to change Account numbers when there are allegations of fraud, so each Account is identified by both account numbers for clarity.

37. Plaintiff discovered the Accounts in April 2025 when she noticed a significant drop in her credit score. Plaintiff did not recognize these Accounts and had not opened them. The Accounts were associated with Pramod's business called Ben E Fit Auto Vault. At no time did Plaintiff ever have an interest in, was employed by, or had any association with, Ben E Fit Auto Vault. Plaintiff confronted Pramod, and he promised to pay the Accounts back, but did not.

38. In June 2025, Plaintiff reported the fraud to Defendant, filed disputes with all three CRAs (as detailed below), the FTC, CFPB, and submitted a police report. Despite this, Defendant closed the investigations repeatedly and persists in holding her responsible for the Accounts. Defendant demanded that Plaintiff jump through many hoops to prove the Accounts were not

Case 1:26-cv-03090-JPC     Document 1-3     Filed 04/15/26     Page 10 of 18

hers, and Plaintiff cooperated, only to find that Defendant persisted in holding her responsible.

39. When Plaintiff followed up with Defendant Plaintiff was informed that the 4129/3513 Account had been opened in person at a Defendant branch, and the 8690/5539 Account was activated using a one-time passcode sent to a number ending in 8285, which is a Verizon telephone number. This number is not Plaintiff's and matches Pramod's telephone number.

40. Plaintiff requested that Defendant review the video footage from the branch location to confirm Plaintiff was not present. A Defendant representative later demanded that Plaintiff provide a letter from Verizon proving the 8285 number is not Plaintiff's. Plaintiff explained that Plaintiff has been a T-Mobile customer since arriving in the U.S. in 2019 and has never had a Verizon account. Verizon provided a letter stating that Plaintiff does not have an active account, but Defendant rejected it, claiming Defendant needed proof that Plaintiff never had a Verizon account at all. Plaintiff then visited a Verizon store in Sugar Land, TX, and provided her SSN for verification. The Verizon store staff, including a manager, confirmed that Plaintiff has never had any account with Verizon and advised that Defendant should contact Verizon directly. Plaintiff had a Defendant fraud representative speak directly with the Verizon manager, who verified her identity and reiterated the same information.

41. On July 25, 2025, Plaintiff visited the Defendant branch at 2410 Hwy 6 in Sugar Land, TX, and spent over two hours with a representative who connected with the fraud department. Plaintiff was told that 3513/4129 had been opened at 41-22 Bell Blvd, Bayside, NY, assisted by an employee named Olga. Plaintiff has never been to that location and again requested video surveillance, which was either ignored or deemed "unavailable."

Page **10** of **18**

42. Defendant sent a fraud investigation closure letter to Plaintiff dated June 23, 2025 (8690/5539). Defendant sent more fraud investigation closure letters to Plaintiff dated June 24, 2025 (4129/3513) and July 2, 2025 (4129/3513). Defendant previously stating in a June 2, 2025 letter that Defendant would close the 4129/3513 Account to protect her. Defendant also previously stated in a June 13, 2025 letter that Defendant would close the 8690/5539 Account to protect her. Defendant then sent fraud investigation closure letters dated July 16, 2025 (8690/5539); July 22, 2025 (8690/5539), July 29, 2025 (for both 4129/3513 and 8690/5539). When Plaintiff received these letters, she felt overwhelmed and terrified.

43. On July 31, 2025, Plaintiff emailed Defendant at fraud.recovery@chase.com in a desperate plea for Defendant to urgently investigate and take her seriously. This email received no response.

44. On August 4, 2025, Plaintiff filed a CFPB complaint regarding the Accounts.

45. In a letter dated August 11, 2025, Defendant closed the fraud case again, citing the cardmember agreement, something Plaintiff never agreed to or received, as Plaintiff never opened these Accounts. A Defendant representative attempted to contact Plaintiff once during work hours, but Plaintiff has since left multiple voicemails with no response.

46. Plaintiff emailed Defendant again on August 29, 2025 to renew her plea for Defendant to close the fraud accounts. Defendant has not.

47. Plaintiff spent dozens of hours on fraud disputes directly to Defendant to no avail.

### *Plaintiff Disputes the Fraudulent JPMorgan Chase Accounts to the CRAs*

48. **June 2 Phone Disputes:** Plaintiff made telephone disputes of the fraudulent Defendant Accounts by phone to the CRAs on or about June 2, 2025 (the "June 2 Phone Dispute[s]"). Experian placed a fraud alert on Plaintiff's credit file on June 2, 2025, in response to the June

Case 1:26-cv-03090-JPC    Document 1-3    Filed 04/15/26    Page 12 of 18

2 Phone Dispute. Plaintiff did not hear back from Equifax in response to Plaintiff's June 2 Phone Dispute. Multiple fraudulent inquiries remained on Plaintiff's Trans Union credit file following her June 2 Phone Dispute.

49. **June 4 Experian Dispute**: In a letter dated June 4, 2025 to Experian ("June 4 Experian Dispute"), Plaintiff followed up to her verbal dispute, detailing how she was an identity theft victim, the fraud involved fraudulent access to her Experian account, and also multiple credit cards in her name with Defendant, Capital One and American Express. Plaintiff provided her police report number, photo identification, a copy of her auto insurance card, and copy of her SSN with her June 4 Experian Dispute.

50. On information and belief, Experian forwarded the substance of Plaintiff's June 4 Experian Dispute to Defendant, who falsely verified the Account 8690/5539 as belonging to Plaintiff. In a response from Experian dated June 30, 2025, the last four numbers on each account were truncated, but 8690/5539 could be identified by its $10,863 balance, and remained after Plaintiff's June 4 Experian Dispute. The 4129/3513 Account was not reporting at that time.

51. **June 11 & 20 Equifax Disputes**: Plaintiff disputed online to Equifax on June 11 and June 20, 2025 (the "June 11 & 20 Equifax Disputes"). On information and belief, Equifax notified Defendant of Plaintiff's June 2025 dispute to Equifax. After Plaintiff's June 2025 dispute to Equifax, Defendant verified that 8690/5539 was reporting accurately even though Defendant could not, had it performed a reasonable investigation, have verified that the disputed information was accurately attributable to Plaintiff. The 4129/3513 Account was not reporting at that time.

52. **June 11 Trans Union Dispute**: Plaintiff disputed by mail to Trans Union in a letter dated June 11, 2025. In this June 11, 2025 dispute, Plaintiff reiterated that she was a victim of

identity theft, and disputed various unauthorized inquiries that had remained following her June Phone Dispute, enclosing a copy of her credit report highlighting the unauthorized inquiries, copy of her SSN card, and car insurance letter to verify her address.

53. **September 4 Equifax Dispute**: Plaintiff disputed online to Equifax on September 4, 2025. In this September 4 Equifax Dispute, Plaintiff attached her police report and explained that she was a victim of identity theft and did not open the Accounts. In a response to Plaintiff dated September 9, 2025, Equifax stated it had deleted Chase account 8690/5539.

54. Plaintiff then obtained her October 19, 2025 credit file disclosure from Experian, which showed a low credit score of 618 and high balances. While Plaintiff's legitimate accounts (Bank of America, student loans, car loan and low-credit limit credit card with Defendant) had excellent payment history, the defaulted fraud credit cards accounted for the low credit score of 618. By this time, Account 4129/3513, the fraudulent account with the significant balance of $49.574, was reporting on Plaintiff's Experian credit file. This 4129/3513 Defendant Account was maxed-out with a credit limit of $50,000 and 60 days past due. It included the notation that the consumer disagreed with the outcome of the dispute.

55. Plaintiff obtained her October 19, 2025 credit file disclosure from Trans Union, which showed a "poor" credit score of 502. While Plaintiff's legitimate accounts (Bank of America, student loans, and her car loan) had excellent payment history, the defaulted fraud credit cards accounted for the poor credit score of 502. By this time, Account 4129/3513, the fraudulent account with the significant balance of $49.574, was reporting on Plaintiff's Trans Union credit file. This 4129/3513 Defendant Account was maxed-out with a credit limit of $50,000 and 60 days past due, with the notation "Dispute resolved; consumer disagrees."

Case 1:26-cv-03090-JPC    Document 1-3    Filed 04/15/26    Page 14 of 18

56. Plaintiff obtained her credit file disclosures from all three CRAs on November 11, 2025, and all three showed Account 4129/3513 reporting with a balance of $49.574, a credit limit of $50,000, 60 days past due, and the notation that the consumer disagreed.

57. **The November 17 Disputes**: In letters dated November 17, 2025 (the "November 17 Disputes") Plaintiff disputed to all three CRAs, and again directly to Defendant, explaining that she was a victim of identity theft and financial domestic abuse perpetrated by her ex-boyfriend, and did not open or authorize the Defendant Account 4129/3513 with a balance of $49,574 and 60 days late. Plaintiff also disputed addresses, inquiries and other information associated with Pramod that do not belong to Plaintiff. Plaintiff's November 17 Disputes included Plaintiff's address, social security number and date of birth, and enclosed her police report, FTC report, a utility bill, a letter from Capital One finding in Plaintiff's favor on a fraud investigation. Plaintiff sent all of her November 17 Disputes via USPS certified mail.

58. On information and belief, Defendant received notice of Plaintiff's November 17 Disputes from the CRAs along with all the enclosures. On information and belief, Defendant also received Plaintiff's November 17 Dispute letter addressed directly to Defendant.

59. In dispute results dated December 10, 2025 that were in response to Plaintiff's November 17 Disputes, the CRAs deleted 4129/3513. At that time, neither fraudulent Defendant Account was reporting on Plaintiff's credit files with the CRAs. Plaintiff believes and therefore avers that this was solely due to the actions taken by each of the CRAs to suppress Defendant's reporting of 4129/3513 and 8690/5539 despite what Defendant was telling the CRAs, because following December 2025, Defendant has persisted in its position that Plaintiff is responsible for repayment of 4129/3513 and 8690/5539.

Page **14** of **18**

Case 1:26-cv-03090-JPC    Document 1-3    Filed 04/15/26    Page 15 of 18

### *Defendant Persists in Holding Plaintiff Responsible for Fraudulent Debt*

60. Undeterred by Plaintiff's many disputes, Defendant sent Plaintiff a letter dated December 4, 2025, stating that this was the "final review" and that she remained responsible for 4129/3513, the nearly $50,000 fraudulent debt, unless Plaintiff could provide "new" information. When Plaintiff received this December 4, 2025 "final review" letter, Plaintiff felt demoralized.

61. **The December 17 Direct Dispute**: Plaintiff disputed directly to Defendant again in a letter dated December 17, 2025 (the "December 17 Direct Dispute") to explain that Verizon had found in her favor on a fraudulent account that Pramod had opened in Plaintiff's name; Plaintiff hoped that providing this new information would corroborate Plaintiff's claims of identity theft and influence Defendant to finally find in Plaintiff's favor. Defendant has failed or refused to do so. Defendant did not respond to Plaintiff's December 17 Direct Dispute.

### *Damages*

62. Plaintiff suffered known and unknown credit damages, including from the publication of Plaintiff's information to third parties.

63. The fraudulent Accounts have had a significant impact on her credit, including on Plaintiff's legitimate account with Defendant. Defendant reduced Plaintiff's credit limit from $3,500 to $1,000 on September 4, 2025.  Plaintiff has been forced to sell the vehicle she purchased from Pramod because the financial domino effect of the fraud has left Plaintiff unable to afford the vehicle. Plaintiff has been chilled from attempting to obtain new credit, and worries constantly about her financial future.

64. At all times pertinent hereto, the conduct of Defendant as well as its respective agents, servants and/or employees, was malicious, intentional, willful, reckless, negligent and in

wanton disregard for the rights of Plaintiff pursuant to the FCRA and NY FCRA.

65. As a direct and proximate result of the willful and negligent actions, conduct, and omissions of Defendant Plaintiff suffered cognizable actual damages, including but not limited to emotional distress, anxiety, frustration, humiliation, embarrassment, and damage to Plaintiff's reputation for creditworthiness.

## FIRST CAUSE OF ACTION
### VIOLATIONS OF THE FCRA

66. Plaintiff realleges and incorporates the above paragraphs as if reasserted and realleged herein.

67. Based on the facts alleged in this Complaint, Defendant violated FCRA § 1681s-2(b) by its acts and omissions.

68. Due to the violations of § 1681s-2(b) by Defendant, Plaintiff suffered actual damages, including but not limited to damage to her reputation, embarrassment, humiliation, anguish and other emotional harm cognizable pursuant to the FCRA.

69. These violations of § 1681s-2(b)(1) were willful, rendering Defendant liable for actual damages, statutory damages, costs and reasonable attorney's fees, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

70. In the alternative, Defendant was negligent, entitling Plaintiff to recover actual damages, costs, and reasonable attorney's fees pursuant to 15 U.S.C. § 1681o.

## SECOND CAUSE OF ACTION
### VIOLATIONS OF GBL § 349

71. Plaintiff realleges and incorporates the above paragraphs as if reasserted and realleged herein.

72. GBL §349(a) states: "Deceptive acts or practices in the conduct of any business, trade or

commerce or in the furnishing of any service in this state are hereby declared unlawful."

73. Defendant engaged in numerous deceptive acts and practices which were directed at the public in general and which harmed Plaintiff as set forth herein.

74. Defendant acted deceptively when it conducted meaningless fraud "investigations" that protect a criminal and further harm both a domestic financial abuse and identity theft victim and the public at large.

75. Defendant acted deceptively when it continued to insist on repayment of fraudulent credit card debts from a crime victim who supplied Defendant with police reports.

76. Defendant acted deceptively when it aided a criminal in opening a fraudulent account at a branch where Plaintiff was not present.

77. Defendant acted deceptively when it refused to provide Plaintiff with information she requested to aid her investigation and law enforcement investigation of the crimes committed under Defendant's watch.

78. Defendant has acted deceptively by continuing to insist on repayment of the fraudulent credit card debts after Plaintiff has disputed multiple times and cooperated with Defendant at every juncture.

79. Defendant has acted deceptively regarding the Accounts in a way that endangers the public at large, by withholding information that Plaintiff could use to bring a criminal to justice and protect the public from him.

80. In addition, Plaintiff has incurred and continues to incur reasonable attorney's fees in her prosecution of this action.

81. Plaintiff has been damaged in an amount exceeding $65,000, plus treble damages, plus punitive damages, plus reasonable attorney's fees, with interest, and the costs of this action,

Case 1:26-cv-03090-JPC   Document 1-3   Filed 04/15/26   Page 18 of 18

the preceise amount of which is respectfully referred to this Court for determination at trial.

**WHEREFORE**, Plaintiff seeks judgment in Plaintiff's favor and damages and equitable relief against Defendant:

1. Awarding against Defendant actual damages, statutory damages, punitive damages, costs and reasonable attorney's fees pursuant to 15 U.S.C. § 1681n and § 1681o, and

2. Such other and further relief as may be necessary, just, and proper.

<u>**DEMAND FOR JURY TRIAL**</u>

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury as to all issues so triable.

*/s/ Adam G. Singer*
**LAW OFFICE OF ADAM G. SINGER, PLLC**
One Grand Central Place
60 E. 42nd Street, Suite 4600
New York, NY 10165
212.842.2428
asinger@adamsingerlaw.com

*Counsel for Plaintiff Ann Mary Abraham*

Page **18** of **18**